1

2

3

4

5

6                        UNITED STATES DISTRICT COURT
                         WESTERN DISTRICT OF WASHINGTON
7                                   AT TACOMA

8    RHONDA STICKLEY,                        Case No. 3:24-cv-05364-TMC

9                     Plaintiff,
                                             ORDER GRANTING DEFENDANT'S
10         v.                                RULE 52 MOTION FOR JUDGMENT AND
                                             DENYING PLAINTIFF'S CROSS-MOTION
11   UNUM LIFE INSURANCE COMPANY OF          FOR JUDGMENT AND MOTION TO
                                             SUPPLEMENT THE ADMINISTRATIVE
12   AMERICA,                                RECORD

13                    Defendant.

14

15                              I.    INTRODUCTION

16         This dispute arises out of Plaintiff Rhonda Stickley's claim for long term disability

17   ("LTD") benefits from Defendant Unum Life Insurance Company of America. Unum

18   administered a disability benefits plan through Stickley's employer, James Hardie Building

19   Products ("James Hardie"). Stickley claims that at the time of her separation from employment

20   in April 2019, she was experiencing extreme fatigue, fever, brain fog, and body aches that

21   impacted her performance so severely that she stopped working. The limited contemporaneous

22   medical records recounted some of Stickley's claimed symptoms but failed to diagnose her or

23   opine on any diminishment of her work capabilities. Three years later, Stickley was diagnosed

24   with Chronic Fatigue Syndrome ("CFS") and fibromyalgia. And one year after that, she was

diagnosed with Esptein-Barr Virus ("EBV"). At that point, Stickley had not worked for James Hardie for four years.

After her diagnoses, Stickley applied retroactively for disability benefits through Unum. Unum characterized Stickley's claim as one for short term disability ("STD") benefits and denied it as untimely. Stickley appealed the denial and made an explicit claim for LTD benefits. Unum construed Stickley's appeal only as to STD benefits and denied her claim because her submitted medical records did not support a claim that she could not "perform[] the material and substantial duties" of her regular occupation as of April 2019. AR 2759. On May 7, 2024, Stickley appealed Unum's second denial and included additional evidence to support her STD and LTD claims.

Stickley sued Unum on May 9, 2024. Dkt. 1. On November 22, 2024, Stickley moved for judgment under Federal Rule of Civil Procedure 52, arguing that Unum had improperly denied her claim for LTD benefits. Dkt. 17. Stickley also moved to supplement the administrative record. Dk. 15. Unum then cross-moved for judgment on the administrative record, claiming that the company did not owe Stickley any benefits. Dkt. 14.

Stickley bears the burden of showing by a preponderance of the evidence that she was disabled within the meaning of the Plan and was entitled to receive LTD benefits. The Court finds that Stickley has not met this burden. Thus, the Court GRANTS Unum's motion (Dkt. 14) and DENIES Stickley's cross-motion (Dkt. 17). The Court also DENIES Stickley's motion to supplement the administrative record (Dkt. 15).

## II.    PROCEDURAL ISSUES

The Plan at issue here is governed by the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001, et seq. ("ERISA"). *See* Dkt. 13-5 at 2 (plan document explaining that the "policy is delivered in and is governed by the laws of the governing jurisdiction and to the extent

applicable by" ERISA); Dkt. 14 at 5 ("This is an ERISA governed case regarding the denial of long term disability and waiver of premium for life insurance benefits.").

ERISA allows a plan participant "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B); *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008) (ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court."). "District courts review a plan administrator's denial of benefits 'under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits.'" *Kieserman v. Unum Life Ins. Co. of Am.*, 574 F. Supp. 3d 896, 899–900 (W.D. Wash. 2021) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). The parties agree that the de novo standard of review applies. Dkt. 17 at 23; Dkt. 14 at 18.

Under de novo review, "[t]he court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits." *Opeta v. Nw. Airlines Pension Plan for Cont. Emps.*, 484 F.3d 1211, 1217 (9th Cir. 2007) (quoting *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006)). Although district courts typically conduct de novo review on the evidence in the administrative record, "other evidence . . . might be admissible under the restrictive rule of *Mongeluzo* [*v. Baxter Travenol Long Term Disability Benefits Plan*, 46 F.3d 938, 943 (9th Cir. 1995)]." *Id.* (internal quotation marks and citation omitted). In *Mongeluzo*, the Ninth Circuit held that extrinsic evidence could be considered "*only* when circumstances *clearly establish* that additional evidence is necessary to conduct an adequate de novo review of the benefit decision." *Id.* (quoting *Mongeluzo*, 46 F.3d at 944) (emphasis in *Opeta*).

The Court's review "can best be understood as essentially a bench trial 'on the papers' with the District Court acting as the finder of fact." *Kieserman*, 574 F. Supp. 3d at 900 (quoting

ORDER GRANTING DEFENDANT'S RULE 52 MOTION FOR JUDGMENT AND DENYING PLAINTIFF'S CROSS-MOTION FOR JUDGMENT AND MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD - 3

*Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003)). In assessing a Rule 52 motion for judgment, a court must ask "not whether there is a genuine issue of material fact, but instead whether [the claimant] is disabled within the terms of the policy." *Id.* (quoting *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094–95 (9th Cir. 1999)). The court "can evaluate the persuasiveness of conflicting testimony and decide which is more likely true." *Id.* (quoting *Kearney*, 175 F.3d at 1094–95). Consequently, "the court may make factual findings, evaluate credibility, and weigh the evidence before it to determine whether the administrator correctly or incorrectly denied benefits." *Id.* (citing *Anderson v. Liberty Mut. Long Term Disability Plan*, 116 F. Supp. 3d 1228, 1231 (W.D. Wash. 2015)).

On de novo review, the plan administrator's determination is given no deference, but the plan participant bears the burden of proving his entitlement to benefits. *Collier v. Lincoln Life Assurance Co. of Bos.*, 53 F.4th 1180, 1186 (9th Cir. 2022); *see also Baxter v. MBA Grp. Ins. Tr. Health and Welfare Plan*, 958 F. Supp. 2d 1223, 1227 (W.D. Wash. 2013). "Because the burden to prove entitlement to policy benefits rests on the claimant, the court must examine whether the participant has established, by a preponderance of the evidence, that the record supports the conclusion that he is entitled to benefits under the policy." *Louis v. Hartford Life & Accident Ins. Co.*, No. C19-56 MJP, 2020 WL 39145, at *7 (W.D. Wash. Jan. 3, 2020) (citing *Muniz v. Amec Constr. Mgmt., Inc.,* 623 F.3d 1290, 1294, 1296 (9th Cir. 2010)).

### III.    FINDINGS OF FACT

1.    Plaintiff Rhonda Stickley was hired on June 25, 2018 as the Chief Human Resources Officer ("CHRO") for James Hardie, a global fiber cement products company with over 3,000 employees, based in Chicago, IL. AR 1198; AR 1201; AR 2795. Before her position at James Hardie, Stickley worked in a series of increasingly senior HR roles in an over 30-year corporate career. AR 2795.

2.      James Hardie offered its employees a disability insurance plan ("the Plan") through Unum Life Insurance Company of America. AR 40, Dkt. 13-5 at 2. The Plan is governed by ERISA. AR 40, Dkt. 13-5 at 2.

3.      The Plan offered both STD and LTD benefits. AR 42, Dkt. 13-5 at 4.

4.      Under the LTD plan, Unum defined an individual as "totally disabled" when the individual was "unable to perform with reasonable continuity the substantial and material acts necessary to pursue your usual occupation in the usual and customary way." Dkt. 13-5 at 19. The Plan explained that "[a]fter benefits have been paid for 24 months of disability you are totally disabled when, as a result of sickness or injury, you are not able to engage with reasonable continuity in any occupation in which you could reasonably be expected to perform satisfactorily in light of your age, education, training, experience, station in life, and physical and mental capacity." *Id.*

5.      Unum defined substantial and material acts as the "important tasks, functions and occupations generally required by employers from those engaged in your usual occupation" and that "cannot be reasonably omitted or modified." Dkt. 13-5 at 38.

6.      Unum's policy also required that an individual be "continuously disabled through [their] elimination period." Dkt. 13-5 at 19. The elimination period was the later of "90 days after the date disability occurs" or "the date your insured group short term disability payments end, if applicable." *Id.*

7.      Unum's policy also requires that "once payments begin . . . you must be under the regular care of a physician unless regular care . . . will not improve your disabling condition(s)" or "will not prevent a worsening of your disabling condition(s)." Dkt. 13-5 at 20. Regular care is defined in the policy as "personally visit[ing] a physician as frequently as is medically required, to effectively manage and treat your disabling condition(s)" and "receiving appropriate medical

treatment and care for your disabling condition(s), which conforms with generally accepted medical standards." *Id.* at 38.

8.      Stickley's role at James Hardie was "extremely demanding." AR 1198. She oversaw ten Vice President and Director-level HR professionals. AR 2795. Within the first eight months of her new position, she also "traveled to nearly all JHX sites around the world with the CEO and COO." AR 2798.

9.      Stickley claims that she was "ill quite frequently during the majority of [her] time" at James Hardie. AR 1198. A letter dated February 3, 2024 from Stickley's husband noted "a significant increase in the frequency of [Stickley] becoming ill" after joining James Hardie, describing illnesses that "worsened to the point of her not being able to get out of bed." AR 1209. Another letter dated January 25, 2024 from her friend Dr. Kamala Rose explains that although Stickley "is not a patient of mine," she observed a "steady decline" in her health as of late 2018. AR 1208. Dr. Rose noted Stickley's extreme fatigue, brain fog, difficulty following conversations, and pain and body aches that impacted her daily activities. *Id.* Stickley, however, only sought medical care on "two or three separate occasions" due to her work and travel schedule before her alleged disability onset date. AR 1198.

10.      On October 30, 2018, Stickley received an "in-depth executive physical" at Northwestern. AR 1196, 2232–2324. The examining doctor noted, "Fatigue, even if [she] gets 8 hrs/sleep. Works pretty hard most of the time and has never had problems with energy." AR 2318. The record also describes that "[i]n past few weeks [she] has noted a little edema bilaterally (usually gets when traveling/flying)." *Id.* The doctor noted that her "C-reactive protein level is elevated." AR 2238. The notes describe that Stickley is "also losing more hair than she thinks is normal . . . . Thinks all over head, although notes at frontal lobe area." *Id.* Finally, her

doctor confirmed her reports of rashes. AR 2322 ("Right anterior shin, circular faint macular erythematous lesion, edge with brighter erythematous dots, no scaling.").

11.    Stickley's reported symptoms did not result in a diagnosis. The examining doctor "suspect[ed] much of her fatigue has to do with increasing weight, high stress levels with new job, and constant international travel (this is likely also contributing to hair loss)." AR 2323; *see also* AR 2238. The doctor also did not "see any underlying cause for the edema [Stickley] noticed recently," because her "kidney function and thyroid function are normal, and if your echo[cardiogram] is also normal than we have excluded the most significant causes." AR 2238. The doctor suggested that the edema "is probably partly due to your weight, which increases the pressure on the veins, and partly due to the pressure changes in the plane and sitting for a long time when flying." *Id.* The doctor also pointed to her elevated C-reactive protein level as associated with "high weights and body fats." *Id.*

12.    Between the time she started working at James Hardie until her last day on April 19, 2019, Stickley described instances where she could not perform her job duties due to her undiagnosed symptoms, including "being bedridden by what seemed like the flu" in September 2018, "miss[ing] deadlines due to being bedridden from severe body aches and exhaustion" in December 2018, and being "late for a meeting while in Dublin because she could not get out of bed due to exhaustion and brain fog" in January 2019. *See* AR 1198.

13.    Stickley has no other contemporaneous medical records from this period. Stickley claims that in January 2019, she was "seen in emergency at Northwestern for strep throat, [an] ear infection and blown eardrum following travel." *Id.* She also claims that a month later she was seen at Northwestern again for an "upper respiratory infection." *Id.* Her citations to the January 2019 instance, other than her own statement, include an April 2021 message to her treating doctor describing a current sinus infection in which she references "a similar issue like this two

years ago when I was in Chicago and also ended up getting strep throat and an ear infection at the same time." AR 1510. Stickley also cites an August 31, 2023 medical record that notes that she had a "burst right ear drum and strep throat five years ago in Chicago." AR 2843.

14. James Hardie's CEO, Jack Truong, emailed Stickley on February 1, 2019 describing several performance issues associated with Stickley's work. AR 2798–99. The email stated that Stickley's "response time to emails, returning phone calls is not meeting expectations." AR 2798. He stated, "You often don't follow up with key priorities assigned to you and your function. You would let important projects slide to the last possible minute. A few times, there were mistakes in papers presented to management and the Board. This is a serious issue that – if not corrected soon – will lead to a loss of confidence in you and your leadership by your ELT colleagues, me, and the Board." *Id.* The email also cited other performance issues, including that Stickley had a "tendency of blaming [her] team rather than taking accountability," and that in "three strategic plan presentations on HR plan going forward from October 2018 to January 2019, [Stickley] did not deliver beyond a generic plan." *Id.*

15. Stickley's last day at James Hardie was April 19, 2019. AR 97.

16. On June 14, 2019, Stickley was prescribed Singulair, which the computerized record notes was based on "[m]ild intermittent asthma with acute exacerbation." AR 635.

17. On January 7, 2020, Stickley visited the emergency room because of gallbladder issues that culminated in surgical removal on January 9, 2020. AR 1214–39. The emergency services doctor noted that she had "no edema" and "no significant rashes at site of pain." AR 1221. Her lab results did show elevated levels of monocytes and eosinophils, AR 1232, but there is no record that any of the treating physicians indicated a cause other than her emergent medical condition. *See generally* AR 1214–39.

1    18.    On January 31, 2020, Stickley messaged her doctor that for "[t]he last three days

2    I've been feeling worse – stomach pain, nauseated, decreasing energy and a horrible rash like

3    I've never seen before. I'm very concerned that there's something else wrong at this point."

4    AR 1291. Stickley visited the emergency room on February 1, 2020. AR 1307. The emergency

5    doctor stated that the "cause of her symptoms are not clear," but based on consultation with

6    Dermatology, her rash "appears most likely [to be] an inflammatory reaction." *Id.* In follow-up

7    communications with a Registered Nurse ("RN") on February 3, the RN stated, "Currently it

8    doesn't seem that this rash is related to the surgery." AR 1283. Stickley wrote back that same

9    day and said the "rash has increased across my feet, ankles and side of stomach. I'm at my wit's

10   end with what is causing this rash." AR 1285.

11   19.    On February 5, 2020, Stickley saw her treating doctor to follow up on her rash

12   and conveyed in a behavioral monitoring intake questionnaire that she was "[f]eeling tired or

13   having little energy." AR 1316. Following her visit, her doctor referred her to a Physician's

14   Assistant ("PA"). Stickley messaged her doctor on February 11 and asked, "What about

15   Rheumatology or Immunology? How does seeing the PA solve for having a follow up with

16   specialist(s)?" AR 1330. Her treating doctor told her the PA would take photos to submit to a

17   dermatologist who "can be the most helpful with these kinds of rashes." AR 1329. On February

18   15 after consulting Dermatology, the PA messaged Stickley that "this rash could be an allergic

19   reaction to surgical preparation cleansers used for your surgery. Difficult to say for sure, but that

20   is mostly likely given timing." AR 1360.

21   20.    In April and June 2020, Stickley had two medical phone visits where she

22   complained of knee pain and swelling, including a Baker's cyst in her left knee and "new pain"

23   in her right knee. AR 1363, 1392–1393.

24

21.    On July 1, 2020, she messaged about "chest pain I've been having off and on the past several months" and that "lately it has been increasing in frequency." AR 1409. On July 10, 2020, she visited her treating doctor complaining of shoulder pain that "[s]tarted about a year ago" and which has "[g]otten worse over time, not better." AR 1420. Stickley also complained of numbness in her lip and left leg. AR 1421.

22.    On November 9, 2020, Stickley called her provider and stated that she had returned from her mother's funeral in California and was "experiencing several COVID like symptoms; body aches, congestion, chills, fatigue, headache, and loss of taste but no fever." AR 1485.

23.    In December 2020, Stickley messaged her treating doctor asking for a referral to an orthopedist because the "[B]aker[']s cyst is at the point where it is inhibiting my daily life/routine and I'm declining." AR 1487–88. In another message in February 2021, she said her knee "continued to ache and swell and cause problems these last few months." AR 1490–91.

24.    On March 9, 2021, Stickley called her doctor and an RN transcribed the symptoms she complained of: "She states she has had fatigue. She feels sharp pain center chest. She complains of arm pain that radiates from shoulder, down the shoulder and sometimes to the jaw. Jaw pain back of jaw near ear (throbbing). Dizziness x 2 yesterday with nausea while standing." AR 1503.

25.    On April 25, 2021, Stickley messaged her doctor that she was "still in need of antibiotics for [her] sinus infection." AR 1510. She continued that "[i]t's been over two weeks now and I am very sick – can barely make it through the day. Extreme pressure in my head, nausea and yellow drainage . . . . To make matters worse, because I'm fighting both this and the fever blister outbreak, I have another outbreak on my lip, no energy and can barely get out of bed for a few hours a day!" *Id.* She noted that she "had a similar issue like this two years ago when

[she] was in Chicago and also ended up getting strep throat and an ear infection at the same time. My immune system is just not strong enough to fight this off without antibiotics." *Id.*

26.     In a COVID-19 screening intake form before a medical appointment on September 27, 2021, Stickley answered "yes" to questions on whether she had a "new onset of fatigue" and a "new onset of an unusual headache." AR 1533.

27.     Stickley began treating with a new primary physician, Dr. Samah Hussain, in January 2022 because of her "continued lack of energy." AR 1562. On February 24, 2022, Dr. Hussain diagnosed her for the first time with chronic fatigue. AR 1630. Dr. Hussain also assessed Stickley as having "possible fibromyalgia" and referred her to rheumatology. *Id.*

28.     On March 24, 2022, Stickley saw rheumatologist Dr. Natalya Warner who completed a trigger point test for fibromyalgia and confirmed diagnoses of CFS and fibromyalgia. AR 1664. Dr. Warner noted that in 2016, Stickley had visited another rheumatologist for her recurring flares of illness and Dr. Rawat had suggested period fever syndrome, which she agreed with. AR 1677.

29.     On March 28, 2022, Stickley applied for Social Security disability insurance ("SSDI"). AR 372, 2220. Stickley listed her disabling conditions as "Myalgic Encephalitis," "Fibromyalgia," and "Periodic Fever Syndrome." AR 376. Stickley also listed that she stopped working due to her disability as of May 1, 2019. *Id.* According to a declaration from Stickley's SSDI attorney, she instructed Stickley to list her disability onset date as the first day of the next month after she stopped working because SSDI would not award benefits going back to 2019. AR 2797. Stickley was approved for disability payments on January 16, 2023 based on a primary diagnosis of fibromyalgia and a secondary diagnosis of neurocognitive disorders. AR 358, 2359. Stickley received disability benefits dating back to March 2021, one year from her application

1    filing date, the maximum allowed by the Social Security Administration. AR 2359; 20 C.F.R.

2    § 404.621(a)(1).

3         30.     Medical evaluations conducted for Stickley's SSDI case confirmed several

4    symptoms underlying Stickley's March 2022 diagnoses, but they did not directly address

5    whether Stickley's disabling condition dated back to April 2019. On July 8, 2022, Dr. Dana Fong

6    completed a Medical Source Statement on behalf of Stickley. AR 963–967. Dr. Fong stated that

7    she had been treating Stickley since June 8, 2022, confirmed that Stickley was experiencing

8    several symptoms associated with CFS that limited her functions, and declared that the

9    symptoms and limitations have been present since she began treating the patient. AR 963–967.

10   Dr. Fong's statement neither lists nor explains findings in Stickley's medical record before she

11   started treating her in June 2022. *See id.* Similarly, in a July 2022 cognitive exam and a

12   September 2022 neuropsychological evaluation conducted as part of the SSDI review process,

13   both examining physicians described Stickley as suffering from a mental or neurocognitive

14   disorder that inhibited her memory, concentration, and ability to complete complex tasks. *See*

15   AR 969–973; 1023–28. The only medical records reviewed outside the SSDI process were

16   Dr. Warner's medical notes from March 24, 2022, which diagnosed Stickley with CFS and

17   fibromyalgia. *See* AR 969, 1023. A Mental Residual Functional Capacity Assessment in

18   November 2022 by Dr. Stephen Drake confirmed that Stickley's ability to "complete a normal

19   workday and workweek without interruptions from psychologically based symptoms" was

20   "Markedly Limited." AR 2215. Once again, Dr. Drake's assessment was noted as a "Current

21   Evaluation," and neither reviewed nor discussed medical records from Stickley's alleged

22   disability onset date. *See* AR 2214.

23        31.     On March 2, 2023, Stickley began seeing a new treating physician, Dr. Emitis

24   Hosoda. AR 2874. On April 3, 2023, Dr. Hosoda diagnosed Stickley with Epstein-Barr Virus

("EBV") based on her blood results. AR 2951 ("INTERPRETATION: Suggestive of a recent Epstein-Barr infection.").

32.    A letter dated February 8, 2024 from Dr. Hosoda (eventually submitted as part of Stickley's appeal to Unum) describes her present diagnoses of EBV, CFS, and fibromyalgia as relating back to symptoms she was experiencing before she left James Hardie. AR 1196. Dr. Hosoda states that "while she was clearly experiencing symptoms, there were no objective test results identifying this condition prior to April 19, 2019" and the symptoms were "overlooked as flu or left undiagnosed until March 24, 2022." *Id.* Dr. Hosoda also notes that EBV "has been steadily present on repeated labs since 3/2023 and most likely contributed symptoms that began in late 2018." *Id.* Dr. Hosoda also stated that the symptoms of EBV, CFS, and fibromyalgia—"extreme fatigue, body aches, brain fog, headaches and even fever"—overlap "and are the same symptoms that Rhonda has been complaining about since late 2018." *Id.* These symptoms, as well as potential triggers like the "stress accompanied by an executive position" and "frequent travel" rendered her "unable to perform essential functions of her role on a steady or predictable basis." AR 1197.

33.    On July 24, 2023, Stickley made her first claim for disability benefits through Unum. AR 17. The form included in the administrative record does not identify the type of insurance policy under which Stickley filed her claim. *See* AR 17–21. Stickley's submission stated that her disability began in January 2019 and continued through the date of filing. AR 19.

34.    On August 21, 2023, Unum sent Stickley a letter that they had "received [her] Short Term Disability claim on July 24, 2023[.]" AR 122. The letter denied Stickley benefits because her "last day of work was April 19, 2019, [her] policy terminated on that date, [and she was] not eligible for benefits[.]" *Id.*

35.     On September 14, 2023, Stickley's counsel sent a letter to Unum requesting her claim file and claim guidelines associated with the claim and "giving notice of their appeal of . . . denial of their claim for short-term disability, long-term disability and waiver of premium benefits" pending Stickley completing her appeal submission. AR 128. In its response letter on September 26, 2023, Unum attached copies of the claim file and the claims manual. AR 162. Unum also wrote that "[w]hile you also request an appeal of the Long Term Disability (LTD) and Life Insurance Waiver of Premium (LWOP) benefit decisions, there are no LTD or LWOP claims associated with your client." AR 163.

36.     On February 15, 2024, Stickley sent a letter through her attorney entitled "Appeal of Denial of Claim for Short Term Disability Benefits/Initial Claim LTD/Initial Claim Life Waiver of Premium." AR 169. In the second paragraph, the letter states, "To the extent required by law, or by Stickley's benefit plans or policies, this letter constitutes her administrative appeal of Unum's decision to deny her STD benefits. This letter also constitutes Stickley's initial claims for LTD and LWOP benefits." *Id.* The letter listed the evidence Stickley "wish[ed] to be considered and included as part of the appeal," including the letter from Dr. Hosoda, her SSDI benefits claim file, and the Northwestern Executive Health Report. AR 169–173.

37.     On March 5, 2024, Unum sent Stickley and her counsel a letter acknowledging "an appeal of [Stickley's] Short Term Disability claim." AR 2614. Then on March 25, 2024, Unum sent Stickley a letter that they had "completed [their] review of [her] Short Term Disability claim" and denied her benefits. AR 2759. The letter stated that "[t]he medical information was reviewed in conjunction with an on-site clinical consultant." *Id.* Unum concluded that "[t]he medical records provided do not illustrate specific medical findings to support ongoing restrictions that would prevent you from performing the material and substantial duties of your occupation as of April 19, 2019." *Id.*

ORDER GRANTING DEFENDANT'S RULE 52 MOTION FOR JUDGMENT AND DENYING PLAINTIFF'S CROSS-MOTION FOR JUDGMENT AND MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD - 14

38.    On May 7, 2024, Stickley sent a letter through her attorney appealing the March 25, 2024 denial. AR 2792–94. The letter included additional documentation to support her claim and asked Unum to "consider the documents and studies contained and/or referenced in this submission." AR 2794.

39.    On May 9, 2024, Unum's internal system registered the May 7 letter with subject line "New Appeal 5/7/24 (ERISA 2018)." AR 2800.

40.    On May 15, 2024, Unum sent an acknowledgment letter to Stickley, characterizing the May 7 letter as an "appeal," although again only for an STD claim. AR 2803. "We received your request for an appeal review of your client's Short Term Disability claim on May 07, 2024. Your client's appeal has been assigned to me for review. We are committed to making an appeal decision within 45 days of receiving your client's written appeal. There may be special circumstances in which the review can take longer. We will notify you if more time is needed." *Id.*

41.    Stickley filed this lawsuit on May 9, 2024. Dkt. 1. On November 22, Stickley moved for judgment under Federal Rule of Civil Procedure 52, arguing that Unum had improperly denied her claim for LTD benefits. Dkt. 17. Stickley also moved to supplement the administrative record to include three excerpts from Unum's claims manual. Dkt. 15. On the same day, Unum cross-moved for judgment on the administrative record, claiming that the company did not owe Stickley any benefits. Dkt. 14.

### IV.    CONCLUSIONS OF LAW

**A.    Stickley exhausted her administrative remedies before filing this lawsuit.**

Unum argues that the Court should deny Stickley's LTD claim because Stickley either violated the Plan terms or did not exhaust available administrative remedies before filing suit.

Dkt. 14 at 2, 16–18. Each argument fails based on either the Plan's plain language or applicable ERISA regulations.

The Supreme Court has "recognized the particular importance of enforcing plan terms as written" in ERISA claims. *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 100 (2013). When reviewing an ERISA plan, a district court must "apply contract principles derived from state law . . . guided by the policies expressed in ERISA and other federal labor laws." *Gilliam v. Nev. Power Co.*, 488 F.3d 1189, 1194 (9th Cir. 2007) (internal citation omitted). "Those direct us to look to the agreement's language in context and construe each provision in a manner consistent with the whole such that none is rendered nugatory." *Dupree v. Holman Pro. Counseling Ctrs.*, 572 F.3d 1094, 1097 (9th Cir. 2009).

First, Unum argues that Stickley is not eligible to receive LTD benefits because she did not first exhaust STD benefits. Dkt. 14 at 4, 17. Unum's Plan contains no such requirement. According to the LTD Plan, eligibility for benefits begins on the later of "90 days after the date disability occurs" or "the date your insured group short term disability payments end, *if applicable*." Dkt. 13-5 at 19, 5 (emphasis added). The Plan's language makes clear that neither exhaustion of STD benefits, nor even an STD application are prerequisites for LTD benefit eligibility. *See id; Heimeshoff*, 571 U.S. at 100.

Second, Unum contends that Stickley's medical records after she left James Hardie do not support that she "was under the regular care of a physician—as required by the terms of the LTD Plan—for any alleged disabling medical conditions for over three years after she stopped working." Dkt. 14 at 8; *see also* Dkt. 20 at 7 ("[T]he records cited by Plaintiff are woefully insufficient to show that she was under the 'regular care of a physician' on April 19, 2019 . . . [and] Plaintiff's LTD benefit claim should be denied on this basis alone."). Once again, the Plan's plain language does not make this a requirement. *Heimeshoff*, 571 U.S. at 100. The LTD

Plan requires that "[o]nce [p]ayments [b]egin . . . you must be under the regular care of a physician unless regular care will not improve your disabling condition" or "will not prevent a worsening of your disabling condition." Dkt. 13-5 at 20. Because Stickley never received disability payments—not coincidentally the subject of this lawsuit—the Plan's requirement is inapplicable. *See id;* Dkt. 1.

Third, Unum argues that Stickley's attempt to "slip a request for an 'initial claim' of LTD benefits into Plaintiff's letter appealing the STD benefit claim decision" should "not be deemed sufficient to initiate an LTD claim." Dkt. 14 at 17. Unum asserts that such "gamesmanship . . . would defeat the entire purpose of ERISA's exhaustion doctrine[.]" *Id.*

"As a general rule, an ERISA claimant 'must avail himself or herself of a plan's own internal review procedures before bringing suit in federal court.'" *Bunger v. Unum Life Insurance Co. of Am.*, 299 F. Supp. 3d 1145, 1164 (W.D. Wash. 2018) (quoting *Diaz v. United Agric. Emp. Welfare Benefit Plan & Tr.*, 50 F.3d 1478, 1483 (9th Cir. 1995)). The exhaustion requirement serves "important policy considerations, including the reduction of frivolous litigation, the promotion of consistent treatment of claims, the provision of a nonadversarial method of claims settlement, the minimization of costs of claim settlement and a proper reliance on administrative expertise." *Id.* (quoting *Diaz*, 50 F.3d at 1483 (9th Cir. 1995)).

The Court first notes that the administrative record does not conclusively show that Stickley's initial claim for benefits did not include an LTD claim. *See* AR 17–21. Although Unum classified the initial claim as one for STD benefits, AR 122, Unum's later characterizations of her appeals as involving only an STD claim ignored Stickley's explicit requests for LTD consideration. *See* AR 169–73, 2614, 2759, 2794, 2803. This disregard cuts against Unum's credibility. Relatedly, even if Unum did not register a claim for LTD benefits when Stickley initially submitted her claim, Unum learned of Stickley's attempt to apply for

LTD benefits when her attorney gave notice of Stickley's intent to appeal. AR 128 ("Please be advised that Rhonda Stickley is giving notice of their appeal of . . . denial of their claim for short-term disability, long-term disability and waiver of premium benefits"); AR 162–163 ("While you also request an appeal of the Long Term Disability (LTD) and Life Insurance Waiver of Premium (LWOP) benefit decisions, there are no LTD or LWOP claims associated with your client."). Given the apparent confusion, Stickley's counsel clarified in a February 15, 2024 appeal letter that "[t]his letter also constitutes Ms. Stickley's initial claims for LTD and LWOP benefits." AR 169. The letter is titled "Appeal of Denial of Claim for Short Term Disability Benefits/Initial Claim LTD/Initial Claim Life Waiver of Premium." *Id.* And Stickley's counsel included several medical records, declarations, and her SSDI file that she "wish[ed] to be considered and included as part of the appeal[.]" *Id.*

Far from "slip[ping] a request" for LTD benefits, Stickley consistently communicated her intent to file, and later appeal, denial of her LTD benefits. *See id;* AR 128; AR 2792–94; *see also* AR 2762 ("What is an appeal? An appeal is your written disagreement with our claim decision and a request for a review of that decision by an Appeals Specialist."). Unum points to no requirement in its Plan—or in the relevant ERISA regulations—that Stickley is barred from appealing an adverse STD determination and concurrently filing an LTD claim. This appeals posture is also not unique to Stickley's case. *See Gray v. United of Omaha Life Ins. Co.*, No. 24-700, 2024 WL 5001915, at *1 (9th Cir. Dec. 6, 2024) ("On March 25, 2022, following independent reviews of Gray's records by medical consultants, United notified Gray that her STD claim would be denied. Gray appealed United's STD denial and simultaneously submitted a claim for LTD benefits."). When no restriction exists in Unum's Plan, ERISA regulations, or Ninth Circuit law, the exhaustion doctrine cannot be used as a cudgel to deny an otherwise valid disability claim.

The same is true of Unum's argument that, even if Stickley's February 15, 2024 letter represented her initial LTD claim, she failed to exhaust the administrative appeal process before filing this suit. *See* Dkt. 14 at 18. Unum's LTD Plan states that a claimant has the "right to bring a lawsuit under Section 502(a) of ERISA following an adverse determination from Unum on appeal." Dkt. 13-5 at 42; *see also* 29 C.F.R. § 2560.503-1(g)(1)(iv) (describing Plan administrator's requirement to "include a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review."). But if the Plan "fails to strictly adhere to all the requirements" of ERISA claims procedures and the violations are not "de minimis," the "claimant is deemed to have exhausted the administrative remedies under the [P]lan." 29 C.F.R. § 2560.503-1(l)(2)(i)–(ii). In such a case, the claimant can "pursue remedies under section 502(a) of the Act," including filing suit, because their "claim or appeal is deemed denied on review[.]" 29 C.F.R. § 2560.503-1(l)(2)(i).

Under the LTD Plan and relevant regulations, Unum has an affirmative obligation to respond to a claim for benefits within 45 days. Dkt. 13-5 at 42 ("Unum will give you notice of the decision no later than 45 days after the claim is filed); 29 C.F.R. § 2560.503-1(i)(3)(i): ("[C]laims involving disability benefits . . . shall be governed by . . . a period of 45 days[.]"). Failure to respond under the timeline prescribed by the Plan and ERISA regulations converts a claim or appeal into one that is "deemed denied." *See Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1103–04 (9th Cir. 2003).

Unum's exhaustion argument fails because it never responded to Stickley's LTD claim, "deem[ing] [it] denied." *See id.* Following Stickley's February 15, 2024 appeal letter, which included her "initial claims for LTD . . . benefits," Unum denied her STD appeal on March 25, 2024, but never acknowledged her LTD claim. *See* AR 2759 ("We have completed our review of your Short Term Disability claim[.]"); *see also* AR 2614 (Unum letter to Stickley on March 5,

2024 acknowledging "an appeal of [Stickley's] Short Term Disability claim."). Contrary to

Unum's assertion, Stickley did file an appeal of the March 25 denial on May 7, 2024. AR 2792–

94. *See* Dkt. 14 at 18. The letter reiterated Stickley's "claims for benefits under her Long Term

Disability ("LTD") claim" and attached new evidence "in response to Unum's March 25, 2024

letter." AR 2793. Although Unum registered the May 7 letter as an appeal by May 9, AR 2800,

and sent an acknowledgment letter by May 15, 2024, Unum once again ignored Stickley's LTD

claim, AR 2803 ("We received your request for an appeal review of your client's Short Term

Disability claim on May 07, 2024."). Unum's failure to respond to Stickley's repeated LTD

benefits claims converts her claim into one that is "deemed denied," exhausting her

administrative remedies under the Plan. *See* 29 C.F.R. § 2560.503-1(l)(2)(i); *Jebian*, 349 F.3d at

1103–04.

Finally, even if the Court does not "deem" Stickley's unacknowledged LTD claim as

denied, administrative exhaustion would be futile. "The [futility] exception 'is designed to avoid

the need to pursue an administrative review that is demonstrably doomed to fail.'" *Smith v. Wkly.

Disability Income Ins.*, No. C09-0937- JCC, 2010 WL 890068, at *2 (W.D. Wash. Mar. 9, 2010)

(quoting *Diaz*, 50 F.3d at 1485). In *Smith*, the claimant sued for both STD and LTD benefits after

his STD claim was denied on appeal. *Id.* at *1. The insured had not filed an LTD claim through

his insurer before suing for LTD benefits. *Id.* The insurer argued that only the STD benefits

could be at issue because the insured never made a claim for the LTD benefits. *Id.* at *3. The

court disagreed. *Id.* The court found that it would be futile to require that the claimant make a

claim for LTD benefits once his STD benefits were denied because the disability standard was

either the same, or after the first two years of LTD benefits, an "obviously . . . stricter standard"

that would result in another denial. *Id.* The same is true here. *Compare* AR 58 (Under the STD

Plan, "you are totally disabled when . . . you are unable to perform with reasonable continuity . . .

your usual occupation") *with* Dkt. 13-5 at 19 (Under the LTD Plan, after two years of disability payments, claimants are "totally disabled" when they are not able to "engage with reasonable continuity in any occupation."). Given Stickley's STD benefit claim was rejected on two separate occasions, AR 122, 2759, exhausting her LTD claim is "demonstrably doomed to fail." *Smith*, 2010 WL 890068, at *3. Accordingly, Stickley has exhausted her administrative remedies.

**B.      No exceptional circumstances warrant consideration of Stickley's extrinsic evidence outside the administrative record.**

Stickley asks that the Court admit excerpts from Unum's claims manual into the administrative record. But for the Court to do so on de novo review, Stickley would have to show that exceptional circumstances demand admission. *See Opeta*, 484 F.3d at 1217. Although district courts typically conduct de novo review on the evidence in the administrative record, "other evidence . . . might be admissible under the restrictive rule of *Mongeluzo* [*v. Baxter Travenol Long Term Disability Benefits Plan*, 46 F.3d 938, 943 (9th Cir. 1995)]." *Id.* In *Mongeluzo*, the Ninth Circuit held that extrinsic evidence could be considered "'*only* when circumstances *clearly establish* that additional evidence is necessary to conduct an adequate de novo review of the benefit decision.'" *Id.* (quoting *Mongeluzo*, 46 F.3d at 944) (emphasis in *Opeta*). These exceptional circumstances include:

> claims that require consideration of complex medical questions or issues regarding the credibility of medical experts; the availability of very limited administrative review procedures with little or no evidentiary record; the necessity of evidence regarding interpretation of the terms of the plan rather than specific historical facts; instances where the payor and the administrator are the same entity and the court is concerned about impartiality; claims which would have been insurance contract claims prior to ERISA; and circumstances in which there is additional evidence that the claimant could not have presented in the administrative process.

*Reetz v. Hartford Life & Accident Ins. Co.,* 296 F. Supp. 3d 1261, 1265 (W.D. Wash. 2017) (quoting *Opeta*, 484 F.3d at 1217).

Importantly, on de novo review, "the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." *Bunger*, 196 F. Supp. 3d at 1157 (quoting *Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1295–96 (9th Cir. 2010)); *see also Gray*, 2024 WL 5001915, at *2 ("Because review is *de novo*, United's handling of the claim has little to no bearing on our analysis[.]"); *Nguyen v. Sun Life Assurance Co. of Canada*, No. 314CV05295JSTLB, 2015 WL 6459689, at *4 (N.D. Cal. Oct. 27, 2015) ("Even if Defendants failed to follow claim procedures or guidelines, that failure might reflect upon the integrity and accuracy of the administrator's review of [the plaintiff's] disability claim, but that review is entitled to no deference on *de novo* review and is therefore irrelevant.") (cleaned up).

Stickley seeks to include three extrinsic records from Unum's claims manual that she contends will "provide clarity as to Unum's own internal policies and procedures, and their failure to abide by those procedures in Stickley's claim." Dkt. 15 at 5; *see* Dkt. 13. The policies are: (Exhibit A) "ERISA: Disability and LWOP Initial Claim Timeframes," describing Unum's 45-day timeline to notify claimants of their benefits determination; (Exhibit B) "Authorizations," outlining the procedure for Unum to obtain information for claim evaluations; and (Exhibit C) "Appeal Procedures," explaining what constitutes an appeal. *See* Dkt. 15 at 6; Dkt. 13. Beyond Stickley's vague assertion that the policy excerpts would provide "clarity," she fails to identify an "exceptional circumstance" that requires this Court to consider this information on de novo review. *See Opeta*, 484 F.3d at 1217; *see also Mullaney v. Paul Revere Life Ins. Co.*, No. CV16-263RAJ, 2018 WL 3328402, at *3 (W.D. Wash. July 6, 2018) (denying plaintiff's request to supplement the administrative record with a declaration purported to "ease understanding" of the existing record because "[c]larification of data that is already in the record is not evidence necessary to conduct an adequate *de novo* review of the benefit decision."). And "[e]ven if

[Stickley] had established the existence of an 'exceptional circumstance' as is required under *Opeta* . . . the court is unpersuaded that the [claims manual excerpts are] relevant to the *de novo* review of [Unum's] disability determination under the Plan." *See Reetz,* 296 F. Supp. 3d at 1266. Exhibits A and C appear to be proffered to counter Unum's argument that Stickley did not exhaust her administrative remedies, *see* Dkt. 15 at 5; Dkt. 14 at 16–18, which the Court has already found satisfied. *See supra* Sec. IV.A. Because Unum's handling of Stickley's claim has "little to no bearing on our analysis" on de novo review, the Court finds that the requested evidence does not meet the high standard for addition to the administrative record. *Gray*, 2024 WL 5001915, at *2; *see also Opeta*, 484 F.3d at 1217.

Stickley alternatively argues that the claims manual excerpts are not extrinsic to the administrative record because they should have properly been included in the administrative record from the start. Dkt. 15 at 2–4. Stickley's argument that the claims manual is part of the administrative record is based on "the plain language of the ERISA regulations," specifically 29 C.F.R. § 2560.503-1(h)(2)(iii). Dkt. 15 at 3. The relevant provision requires that a "claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits." 29 C.F.R. § 2560.503-1(h)(2)(iii). "Whether a document, record, or other information is relevant to a claim for benefits shall be determined by reference to paragraph (m)(8) of this section." *Id.* Paragraph (m)(8) then outlines the applicable relevance standards. *See* 29 C.F.R. § 2560.503-1(m)(8).

The authorities Stickley cites to support this argument do not apply to ERISA cases on de novo review or to the procedural posture of the case. First, Stickley cites several cases that were decided under an abuse of discretion standard—a standard where an insurer's adherence to its own policies tends to be more relevant. Dkt. 15 at 3–4; Dkt. 21 3–4; *see, e.g.*, *Howard v. Blue*

*Cross Blue Shield of Arizona*, No. CV-16-03769-PHX-JJT, 2018 WL 5776420 (D. Ariz. Nov. 2, 2018); *Leu v. Cox Long-Term Disability Plan*, No. 208-CV-00889-PHX-JAT, 2009 WL 2219288, at *2 (D. Ariz. July 24, 2009); *Glista v. Unum Life Ins. Co. of Am.*, 378 F.3d 113, 123 (1st Cir. 2004) (interpreting 29 C.F.R. § 2560.503–1(h)(2)(iii) to admit an insurer's risk management policies and training materials under an abuse of discretion standard because the administrator's interpretation of the Plan's terms "is relevant in assessing the reasonableness of the administrator's decision.").

Second, even Stickley's citations to cases decided under de novo review involve discovery disputes where the plaintiff sought materials withheld by the insurer. *See Nguyen v. Sun Life Assurance Co. of Canada*, No. 314CV05295JSTLB, 2015 WL 6459689, at *3–4 (N.D. Cal. Oct. 27, 2015) (finding that communications between the plaintiff and his medical providers referenced in plaintiff's benefits determination and that were not produced in the administrative record are "part of the administrative record and must be produced. . . [i]f any such material exists and has not yet been produced to the plaintiff[.]"); *Bourland v. Hartford Life & Acc. Ins. Co.*, No. C13-6056 BHS, 2014 WL 4748218, at *3 (W.D. Wash. Sept. 24, 2014) (ordering insurer to "produce documents," including the insurer's administrative processes, during discovery because they were considered relevant under 29 C.F.R. § 2560.503–1(h)(2)(iii)).

Here, there is no discovery dispute because Unum has already produced the claims manual to Stickley in response to her request, while maintaining that the entire claims manual is not part of the administrative record. AR 162 ("We have also enclosed a copy of the claims manual as of August 21, 2023."); *see also* 29 C.F.R. § 2560.503-1(h)(2)(iii) ("[A] claimant shall be provided . . . *reasonable access to, and copies of*, all documents, records, and other information relevant to the claimant's claim for benefits.") (emphasis added). Thus, the remaining purpose of Stickley's motion to supplement the administrative record is to "assist the

1    Court in performing a *de novo* review of the claim." *See* Dkt. 21 at 6. For the reasons explained

2    above, Unum's handling of Stickley's disability claim relative to excerpted guidelines outlined in

3    the claims manual is not relevant to this Court's review. *See Gray*, 2024 WL 5001915, at *2.

4    Accordingly, Stickley's motion to supplement the administrative record, Dkt. 15, is DENIED.

5    **C.    Stickley has not met her burden of proving total disability by a preponderance of the evidence as of April 19, 2019.**

6

7           Having concluded that Stickley has exhausted her administrative remedies and

8    determined the administrative record the Court will consider, the Court now assesses whether

9    Stickley has shown by a preponderance of the evidence that she was disabled under the Plan

10   when she stopped working on April 19, 2019. *Louis*, 2020 WL 39145, at *7 (citing *Muniz,* 623

11   F.3d at 1294, 1296) (explaining that the preponderance standard applies).

12          Stickley argues that she has provided sufficient evidence to show she was disabled, citing

13   the symptoms documented in the October 2018 Northwestern executive physical; "over 2,000

14   pages of medical records" since November 2019 that she claims also documented symptoms of

15   her eventual diagnoses; the 2024 letter from Dr. Hosoda stating that the symptoms associated

16   with her diagnoses are the same symptoms she was complaining about since late 2018; the email

17   from CEO Jack Truong concerning her job performance; the SSDI determination of her

18   disability; and statements from her, her husband, and her friend describing her symptoms around

19   the time she stopped working. Dkt. 17 at 24. Unum argues that even if Stickley had a viable LTD

20   claim as of March 2022 when she received diagnoses of CFS and fibromyalgia, Stickley "bears

21   the burden of proving . . . that she was disabled from her own occupation three years earlier

22   when she stopped working for James Hardie and that she was continuously disabled thereafter."

23   Dkt. 20 at 17. Unum contends that Stickley's proffered evidence does not persuasively connect

24

her later diagnoses to the alleged onset of her disability in April 2019. *Id.* at 17–18. The Court agrees.

The Court first notes that the "Ninth Circuit has repeatedly found that certain conditions are largely []self-reported illness[es] that cannot be diagnosed through any objective medical test." *Waldron v. Unum Life Insurance Co. of Am.*, 3:24-cv-05193-TMC, 2025 WL 949028, at *9 (W.D. Wash. Mar. 28, 2025) (quoting *Perryman v. Provident Life & Accident Ins. Co.*, 690 F. Supp. 2d 917, 945 (D. Ariz. 2010)). "This is especially true for certain difficult to diagnose conditions, such as chronic fatigue syndrome (CFS) . . . [and] fibromyalgia." *Id.* (citing cases); *see also Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 677 (9th Cir. 2011) ("There is no blood test or other objective laboratory test for chronic fatigue syndrome."). Still, a "claimant's 'subjective evidence is persuasive only to the extent it is corroborated by other evidence of medically documented impairments showing that she has functional limitations or restrictions that render her disabled from working.'" *Louis v*, 2020 WL 39145, at *8 (quoting *Perryman.*, 690 F. Supp. 2d at 943).

Stickley's contemporaneous evidence of her disability is significantly limited. Stickley presents only one contemporaneous medical record before leaving James Hardie that she claims corroborates the statements in her February 2024 declaration of "severe exhaustion," "brain fog," "body aches," and flu-like symptoms during this period. AR 1198; *see* AR 2232–2324. The October 2018 Northwestern physical noted Stickley's "fatigue, even if [she] gets 8 hrs/sleep" and "problems with energy," as well as documenting instances of rashes, hair loss, and "a little edema." AR 2318, 2238, 2322. While it is undisputed that the Northwestern doctors did not diagnose Stickley, *see* Dkt. 17 at 10, Dkt. 14 at 22, there is also little support within the medical record for the severity of symptoms Stickley alleges that left her "bedridden" for several days before and immediately after this medical visit. *See* AR 1196, 1198, 2318–2324. And even if the

Court construed Stickley's citations to medical records several years later in which she stated she suffered from a "strep throat and ear infection" and a "burst right ear drum" when she was "in Chicago," as contemporaneous with this period, the combined records are unconvincing that Stickley was more likely than not "totally disabled" within the terms of the Plan in April 2019. *See* AR 1510, 2843; *see also Louis*, 2020 WL 39145, at *8 ("The sparse medical records during the . . . Elimination Period . . . fail to support [plaintiff's] claim that he was Totally Disabled throughout that time.").

Stickley's contemporaneous non-medical evidence is similarly limited and inconclusive. Stickley argues that Truong's February 2019 email "specifically called out ways in which [she] was not performing the material duties of her job." Dkt. 17 at 9. Although Truong describes performance issues like timeliness and mistakes made in important presentations that Stickley argues were caused by her disability, other issues cited in the email are less correlative. *See* AR 2798 ("You have the tendency of blaming your team rather than taking accountability[.]"). While the email shows Stickley was not performing her position up to standard, it does not create a reasonable inference that she was struggling at work "as a result of her illness." *See Perryman*, 690 F. Supp. 2d at 950 (crediting evidence of plaintiff's disabling CFS from a supervisor that said he had to "continuously cover for her during her last four or five months of work as she could not remember anything that was going on" and a coworker that said plaintiff tried to work from home "when she was too fatigued or sick to get out of bed.").

Declarations by Stickley, her husband, and her friend made almost five years after she stopped working at James Hardie are also not persuasive evidence of her disability in April 2019. *See* 1198–99, 1208–1209. Although the declarations describe Stickley's declining condition while employed at James Hardie, the statements are not corroborated by contemporaneous evidence of her "functional limitations or restrictions that render[ed] her disabled from working."

*Louis*, 2020 WL 39145, at *8; *see also Thompson v. Standard Ins. Co.,* 167 F. Supp. 2d 1186, 1194 (D. Or. 2001) (finding medical report persuasive despite being submitted over a year after alleged onset date in part because its findings mirrored plaintiff's "contemporary writings—a handwritten letter and diary entries—reflect[ing] both his frustration with his inability to resume and sustain his predisability activity level and his sincere desire to do so."). Here, not only do the statements lack reference to contemporaneous writings or observations in the record that confirm Stickley's alleged decline, but the limited medical evidence also does not support that Stickley was experiencing "a significant increase in the frequency of . . . becoming ill." AR 1209; *see Louis*, 2020 WL 39145, at *8.

Stickley's medical reports following her April 2019 separation date until her March 2022 diagnoses are also limited and intermittent. The Court again notes that Stickley's medical records after April 2019 and the elimination period can support a finding of disability. *See Waldron*, 2025 WL 949028, at *14; *see also Smith v. Brown*, 849 F.2d 1222, 1225 (9th Cir. 1988) ("It is obvious that medical reports are inevitably rendered retrospectively and should not be disregarded solely on that basis.") (citation omitted). Late medical records are most persuasive, however, where the potentially disabling conditions documented "relate back" to the alleged onset of disability. *See Louis*, 2020 WL 39145, at *8; *see also Witney v. United of Omaha Life Ins. Co.*, 2022 WL 4483179, at *11 (W.D. Wash. September 27, 2022) (crediting medical statements made up to six months after the elimination period because the statements were "consistent with [the providers'] contemporaneous notes" and "based on their consistent and numerous interactions with and observations of Plaintiff.").

Stickley's medical records and communications with her health care providers between June 2019 and March 2022 neither consistently describe symptoms of her eventual diagnoses, nor persuasively relate Stickley's documented symptoms back to April 2019. The first relevant

medical records after she stopped working at James Hardie begin in January 2020, nine months after her alleged disability onset date. AR 1214–39. Interpretation of the medical records is further complicated by Stickley's emergent gallbladder issue. *See id.* Although Stickley contends that certain problems, such as her "decreasing energy and a horrible rash like I've never seen before," AR 1291, 1295, relate back to symptoms she alleges experiencing before she stopped working, her treating providers at least partially attribute the symptoms as reactions to the recent surgery. *See* AR 1360 ("[This rash could be an allergic reaction to surgical preparation cleansers used for your surgery. Difficult to say for sure, but that is mostly likely given timing."). And even before the surgery, concurrent medical observations undercut the consistency of Stickley's other alleged symptoms noted in the October 2018 physical. *See* AR 1221 (emergency services doctor noting pre-surgery that she had "no edema" and "no significant rashes at site of pain.").

Stickley further argues that she "sought treatment for her fatigue, headaches, rashes[,] and pain" regularly between April 2020 and September 2021. Dkt. 22 at 12–13. The record is more equivocal. Between April and June 2020, Stickley complains only of knee pain, mentioning in a June 2020 report that "[n]ew pain has developed in right knee that is different and more painful." AR 1392–1393; AR 1363. In December 2020, she mentions continued pain in her other knee that "is at the point where it is inhibiting my daily life/routine and I'm declining." AR 1488. And even when Stickley describes symptoms in March 2021 that were documented in the October 2018 physical, such as fatigue, the same reports lists several other symptoms unsupported by evidence contemporaneous with when she stopped working. *See* AR 1503 ("She feels sharp pain center chest. She complains of arm pain that radiates from shoulder, down the shoulder and sometimes to the jaw. Jaw pain back of jaw near ear (throbbing)").

Dr. Hosoda's 2024 letter in support of Stickley's disability claim tries to relate the March 2022 diagnoses of CFS and fibromyalgia and her 2023 diagnosis of EBV to symptoms Stickley

alleges she experienced before she stopped working. Stickley cites *Fontana v. Guardian Life Ins.* for the proposition that a later diagnosis for symptoms documented, but not properly diagnosed at the alleged onset date, is relevant evidence of disability. No. C08-01231 CRB, 2009 WL 73743, at *3–5 (N.D. Cal. Jan. 12, 2009); Dkt. 17 at 25. In *Fontana*, the district court decided that the insurer abused its discretion when it gave no weight to a specialist's diagnosis five months after the relevant disability determination date. *Id.* at *3. The specialist's report stated that his diagnosis applied to the time before the relevant disability determination date. *Id.* at *4. The specialist's report also described symptoms identified by two other physicians during the relevant period that were consistent with the specialist's report, despite the physicians' alleged misdiagnosis. *Id.* Finally, the court noted that the new diagnosis, based on a study the specialist described as the "gold standard," was relevant because "there is nothing in the administrative record that suggests that what was observed" in the study five months after the relevant disability date "would not have been observed" if taken on the disability date. *Id.* at *2, *4.

Although Dr. Hosoda's letter states that Stickley was incorrectly diagnosed or undiagnosed until March 2023 and was "clearly experiencing symptoms" of CFS, fibromglia, and EBV before April 19, 2019, the persuasiveness of her letter is distinguishable from the specialist's letter in *Fontana*. *See* AR 1196. The description of symptoms that Dr. Hosoda states Stickley was "clearly experiencing" in late 2018 and that are hallmarks of these diagnoses—"extreme fatigue, body aches, brain fog, headaches and even fever"—are only partially supported by the one contemporaneous medical record from this period. *See* AR 2318–19 (noting only "fatigue" and "a little edema" among the relevant descriptors); AR 1196. The symptoms Dr. Hosoda attributes to Stickley in late 2018 appear to come only from Stickley's alleged symptoms documented in her 2024 statement. *See* AR 1196 ("Symptoms of [EBV, CFS and fibromyalgia] . . . are the same symptoms that Rhonda has been complaining about since late

2018"); AR 1198 (describing being bedridden from "severe body aches and exhaustion," "brain fog" and "flu"-like symptoms). Even if Dr. Hosoda's statement refers to the totality of medical records prior to her March 2022 diagnoses, as discussed above, the lack of consistency in even Stickley's self-reported symptoms from June 2019 up until the diagnoses belie a finding that she was "clearly experiencing symptoms" of CFS, fibromyalgia, and EBV before April 19, 2019. *See* AR 1196.

And unlike the five-months-late diagnosis in *Fontana*, Stickley's diagnosis three years after the alleged onset of her disability fails to show on these facts that her disabling condition "relates back" to April 2019. *See* AR 1196; *Fontana*, 2009 WL 73743, at *4; *Louis*, 2020 WL 39145, at *8; *cf Hyder v. Kemper Nat. Servs.*, Inc., No. C 05-1782 CW, 2006 WL 1821230, at *3–4, 11 (N.D. Cal. June 30, 2006), modified, No. C 05-1782 CW, 2006 WL 3734376 (N.D. Cal. Dec. 18, 2006), and *aff'd*, 302 F. App'x 731 (9th Cir. 2008) (finding a physician's new diagnosis three years after the alleged onset date persuasive evidence of disability where plaintiff's previous doctor attributed her illness to another cause, but the misdiagnosing doctor still found plaintiff disabled from work based on symptoms documented in contemporaneous medical records). Finally, the *Fontana* court determined that the new diagnosis should have been considered by the insurer under abuse of discretion review. *Fontana*, 2009 WL 73743, at *3–4. But the question for this Court on de novo review is not whether Dr. Hosoda's letter is relevant, which it is, but whether it is persuasive that Stickley was more likely than not "totally disabled" as of April 2019. *See id; Louis*, 2020 WL 39145, at *1. Without contemporaneous evidence in the record corroborating that Stickley was totally disabled when she stopped working, the letter alone cannot carry Stickley's burden. *See Louis*, 2020 WL 39145, at *8.

Likewise, Stickley's SSDI determination, while relevant, is also not persuasive evidence on its own that she was totally disabled as of April 2019. "While the [Social Security

Administration] Decision is not binding, the Court will consider [Stickley's] SSA Decision in evaluating whether [Stickley] was disabled under the terms of the [Plan]." *Nagy v. Grp. Long Term Disability Plan for Emps. of Oracle Am., Inc.*, 183 F. Supp. 3d 1015, 1025 (N.D. Cal. 2016), *aff'd*, 739 F. App'x 366 (9th Cir. 2018); *see also Biggar v. Prudential Ins. Co. of Am.*, 274 F. Supp. 3d 954, 970 (N.D. Cal. 2017) ("A decision by the SSA awarding disability benefits is not binding on an insurance company's disability determination, although it is some evidence of disability.") (cleaned up).

*Nagy* is instructive for the relative weight to give Stickley's SSDI determination. There, the court credited a decision that found plaintiff suffered from "severe" impairments, including CFS, in its de novo review of the administrative record. 183 F. Supp. 3d at 1030. In describing the evidentiary value of the disability finding, the court noted that the SSA "underwent three different reviews" of Nagy's claim, ending in a hearing where the ALJ "heard testimony from the claimant, evaluated the medical record, and made a well-reasoned disability determination[.]" *Id.* at 1025. The court concluded that "the ALJ's greater access to witness and expert testimony" made the ALJ's "well-supported conclusion that Nagy could not return to his job . . . persuasive." *Id.* at 1030.

Here, Stickley's disability determination was not made by an ALJ weighing the relevant evidentiary record, expert testimony, and Stickley's own testimony. *Id*; AR 2359. Instead, the SSA approved Stickley's application based on a primary diagnosis of fibromyalgia and a secondary diagnosis of neurocognitive disorders. AR 2359. And while medical evaluations conducted for Stickley's SSDI case confirmed several symptoms underlying her March 2022 diagnoses of CFS and fibromyalgia, the evaluations neither weigh conflicting evidence in the record nor ever address whether Stickley's disabling condition was present when she stopped working in April 2019. *See* AR 963–967 (Dr. Fong's statement neither lists nor explains findings

in Stickley's medical record before she started treating her in June 2022); AR 969, 1023 (cognitive and neuropsychological evaluations only reviewed March 2022 medical records); AR 2214 (Mental Residual Functional Capacity Assessment noted as a "Current Evaluation," and did not review or discuss prior medical records, including from alleged disability onset date). Because the SSDI records are silent on the core question in this case, the Court does not find the SSDI determination on these facts particularly persuasive. *See Nagy*, 183 F. Supp. 3d at 1030. Accordingly, Stickley has not proved by a preponderance of the evidence that she was disabled as of April 19, 2019.

## V.    CONCLUSION

For the reasons explained, the Court finds that Stickley has not met her burden that she was disabled within the meaning of the Plan and was entitled to receive LTD benefits. Thus, the Court GRANTS Unum's motion (Dkt. 14) and DENIES Stickley's cross-motion (Dkt. 17). The Court also DENIES Stickley's motion to supplement the administrative record (Dkt. 15).

Dated this 10th day of April, 2025.

Tiffany M. Cartwright
United States District Judge